UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


CLAYTON CLINE,

    Plaintiff

v.                                      Civil Action No.: 2:05-0885

DR. MARK HANBY, MARK D.
HANBY, II, DALE A.
ALLISON, JR., and STEVEN T.
ALLISON,[1]

    Defendants


MEMORANDUM OPINION AND ORDER


      Pending before the court is (1) the motion of defendant

Dr. Mark Hanby, filed November 4, 2005, seeking dismissal of this

action and (2) plaintiff's motion to dismiss Count I of defendant

Stephen T. Allison's counterclaim.


I.


      Sometime in early July of 2002, defendant Dr. Mark

Hanby ("Dr. Hanby"), a Christian minister, was speaking at a

_____

    [1] The pleadings before the court indicate that plaintiff
should have named "Stephen T. Allison" as a defendant instead of
"Steven T. Allison."

1

convention at the Cedar Lake Christian Center in Georgia.[2]
(Cline Depo. at 17; attached as Ex. C to Dr. Hanby's Mot. to
Dismiss.)  Prior to delivering his religious message at this
convention, Dr. Hanby mentioned Kingdom Vision Network ("KVN"), a
for-profit Christian based broadcasting network, in which Dr.
Hanby served as the Chairman and Chief Executive Officer.  (Id.;
Compl. at ¶ 3.)  Dr. Hanby invited those in attendance who wished
to obtain more information about his "vision" for KVN to meet
with him in a separate room.  (Id. at ¶ 18.)  Plaintiff Clayton
Cline, a resident of Gilbert, West Virginia, had traveled to
Georgia for this convention.[3]  (Compl. at ¶ 1, Cline Depo. at 17-
18.)  Cline, along with eight to twelve others, accepted Dr.
Hanby's invitation and met with him in a separate room later that
day.  (Cline Depo. at 18.)

        Dr. Hanby explained that he was seeking potential
investors for KVN and informed them they would have the

_____

[2] Through much of the briefing in this action, Cline refers
to "Dr. Hanby."  Cline subsequently informed the court that
during the course of discovery he learned that Dr. Hanby does not
possess a college degree, but rather an honorary doctorate in
theology in ministry.  Although the title Doctor may not be
appropriate here, in accordance with the style of the case and
the majority of the briefing, the court will refer to "Dr.
Hanby."

[3] At his deposition Cline testified that he is a resident of
Baisden, West Virginia. (Cline Depo. at 4.)

opportunity to purchase KVN stock and enter into revenue sharing agreements.  (Id.; Dr. Hanby's Interr. Resp. at No. 3, attached as Ex. 7 to Cline's Resp. to Def.'s Mot. for S.J.)  According to Cline, Dr. Hanby emphasized the good works of KVN and its potential to serve the Christian community through the broadcasting of family-oriented television programs and religious services.  (Cline Aff. at ¶ 9, attached as Ex. 3 to Cline's Resp. to Def.'s Mot. for S.J.)  Cline expressed interest in the investment opportunity and informed Dr. Hanby that he thought he could afford to invest a million dollars in the "vision." (Id. at ¶ 10; Dr. Hanby Depo. at 77, attached as Ex. 1 to Pl.'s Memo in Supp. of Mot. for S.J.)  Cline did not make an immediate investment.  Dr. Hanby also told Cline he would have his son speak to him about an investment by Cline.  (Dr. Hanby Depo. at 102.)

Shortly thereafter, Dr. Hanby's son, Mark Hanby II ("Hanby II"), contacted Cline at the request of Dr. Hanby.  (Id.) Hanby II, who was serving as Executive Vice President and Chief Operations Officer of KVN, arranged a meeting between himself and Cline in Charleston, West Virginia on July 15, 2002.  (Compl. at ¶ 8.)  The meeting subsequently took place as scheduled and Cline's personal attorney, Erwin Conrad, also attended the

meeting.   (Cline Aff. at ¶ 10.)

According to the allegations in the complaint, at the meeting in Charleston, Hanby II, with the full knowledge and participation of all the defendants, made the following material misrepresentations and omission of material facts regarding KVN:[4]

> (1) Falsely representing that KVN Series B common shares were typically sold for $3.00 per share when they had, in fact, been previously offered and sold at substantially less than $3.00;

> (2) Intentionally and improperly concealing that there were, in addition to the Series B common shares in KVN, outstanding preferred shares and Series A common stock in KVN, both of which had superior rights to those of Series B shareholders;

> (3) Fraudulently concealing two existing Private Placement Memoranda ("PPM") relating to KVN Series A and Series B common shares;

> (4) Intentionally and improperly concealing the true financial condition of KVN, including the fact that it did not have sufficient capital to meet its financial need for as short a period as the next ninety days;

> (5) Misrepresenting and otherwise failing to fully disclose the company's business plan, credit arrangements or other information known to him and the Defendants to be necessary for the proper evaluation of the advisability of investing in KVN;

> (6) Misrepresenting that KVN owned an internet

---

[4] The "participation" of the defendants appears to be, at least in part, their awareness and approval of the presentation and the alleged misrepresentations and omissions of Hanby II. (Compl. at ¶ 8.)

4

company as well as a subsidiary company named The
Vision Channel, Inc. ("TVC"), a television station
that broadcast Christian programming on the Dish
Network;[5]

(7) Misrepresenting that TVC had an agreement
with the Turner Group to broadcast on the Dish
Network;[6]

(8) Misrepresenting that KVN owned 230 movies,
six to seven comedy libraries, $3,500,000 in
broadcasting equipment and ESPN's former broadcasting
facilities in Charlotte, North Carolina; and

(9) Misrepresenting that any investment with KVN
would "yield money for Christian works," thereby
exploiting their knowledge that Cline was a devout
Christian.

(Compl. at ¶¶ 10-16, 19.)  At some point shortly after

Cline's meeting with Hanby II, counselor Conrad encouraged

Cline to do additional research on KVN or give Conrad time

to conduct research before making the investment.  (Cline

Depo. at 30-31.)  Cline declined to follow this advice, and

---

[5] Although Cline states, without support, in his response to
the motion to dismiss that it was misrepresented that TVC was a
subsidiary of KVN, this does not appear to have been developed in
discovery and may have been a misstatement.  Indeed, the
remainder of the parties' briefing, including that submitted by
Cline, appears to acknowledge that TVC was in fact a subsidiary
of KVN.

[6] Cline's affidavit subsequently alleges that Hanby II
advised him that "KVN had a long term contract with the Turner
Group that allowed it to broadcast via a well positioned channel
on the Dish Network . . . (Cline Aff. at ¶ 11, attached as Ex. 3
to Pl.'s Memo in Resp. to Dr. Hanby's Mot. for S.J.)  It is
unclear whether either KVN or TVC had such a purported contract.

stated that "I did not check anything."  (Id.)

        Following the meeting, defendant Dale Allison, Jr.
("Dale Allison"), a director of KVN, sent Conrad a letter dated
July 18, 2002.  (Id. at ¶ 17.)  Enclosed with the letter was the
registration statement for KVN preferred shares.  (Id.)  The
registration statement stated that KVN preferred shares were
being offered at $3.00 per share. (Id. at ¶ 18.)  The letter
further represented that the July 25, 2001, registration
statement was "the newest document that we have that tells about
KVN."  (Id.)

        Cline makes a number of allegations relating to
Allison's representations in the letter including: (1) the
"newest" document describing KVN was not the registration
statement, rather it was KVN's Quarterly Statement (10-QSB Form)
filed with the Securities and Exchange Commission ("SEC") on
November 28, 2001;[7] (2) Allison, as well as the other defendants,

_____

        [7] The court has undertaken review of KVN's amended 10-QSB
form, which is attached as Ex. A to plaintiff's complaint.  It
reveals that KVN was a company that was far from profitable.
Among other things, the 10-QSB form indicates that for the nine
month period ending September 30, 2001, KVN had $10,649.00 in
total revenue only $260.00 of which came from "airtime sales."
For that same nine month period, KVN had $2,949,082.00 in total
operating expenses.  Despite having been incorporated since March
of 2000, the company explained in the form that it was still in
the "development stage."  The 10-QSB form is publically available

were aware in July of 2002 that KVN preferred shares were no longer being offered at $3.00 a share; and (3) Allison used the registration statement to bolster the defendants' prior misrepresentations that KVN's Series B shares were being sold for $3.00. (Pl.'s Resp. to Dr. Hanby's Mot. to Dis. at 4)  According to Cline, had the defendants disclosed the PPMs it would have been apparent that KVN's Series B shares had been offered at less than $2.00 per share in 2000 and 2001.[8]  (Compl. at ¶ 19.)

A subscription agreement was presented to Cline whereby he would purchase 250,000 Series B shares in KVN at a price of $2.00 per share.[9]  (Subscription Agreement, attached as Ex. B to

---

and Cline does not allege that he did not have access to it.

[8] The 10-QSB form further provides in relevant part as follows

> During the year ended December 31, 2000, the Board of Directors authorized the issuance of 12,500,000 Series B common shares at $ .40 per share through two separate Private Placement Memorandum's pursuant to Regulation D, Section 505 of the Securities Act of 1933, as amended.  As permitted by Regulation D, these Private Placement Memorandums have not been registered with the Securities and Exchange Commission.

[9] The subscription agreement is not discussed at any length by the parties, but the representations made by Cline in the agreement are germane.  The top portion of the agreement provides that Cline is subscribing to 250,000 shares of Series B stock in KVN at a price of $2.00 per share.  Cline then makes the following representations,

Pl.'s Compl.)  Cline paid the purchase price of $500,000.
(Compl. at ¶ 21.)  Cline insists that the subscription agreement
is fraudulent inasmuch as it did not disclose the prior sale
price of Series B common shares or mention the PPMs.  (Id. at ¶
20.)  Cline executed the subscription agreement on July 25, 2002,
and it was signed by a company representative on August 1, 2002.

_____

> (a)  The Investor is a person who is able to
> bear the economic risks of an investment in the
> securities offered . . . and is able to sustain a
> loss of the investment;
>
> (b)  The Investor has such knowledge and
> experience in financial and business matters that he
> is capable of evaluating the merits and risks of an
> investment in Kingdom Vision;
>
> (c)  The Investor has been advised that he may
> wish to be represented by an experienced financial
> planner . . . to assist in and advise in making this
> investment;
>
> (d)  The Investor has had the opportunity to ask
> questions of and receive answers from any executive
> or key employee of Kingdom Vision; and the Investor
> has had an opportunity to obtain additional
> information necessary to verify the accuracy of the
> information referred to in this Subscription
> Agreement;
>
> (e)  I understand that my investment is
> speculative and subject to a high degree of risk, and
> the loss of the investment made will not affect my
> financial stability.

As a further note, the subscription agreement lists Cline's
occupation as "Business Owner-Coal/Leasing" and also
indicates his net worth was in excess of $1,000,000.

(Subscription Agreement, attached as Ex. B to Pl.'s Compl.)  A stock certificate, consistent with the terms of the subscription agreement, was issued to Cline on August 6, 2002. (Stock Certificate, attached as Ex. C to Pl.'s Compl.)

In addition to his purchase of stock in KVN, Cline also executed a revenue sharing agreement with TVC on July 22, 2002. (Compl. at ¶ 24.)  Under the agreement, Cline paid TVC $500,000 to help it cover its purported expenses associated with broadcasting on the Dish Network.  (Id.)  In exchange, Cline was to receive five percent of TVC's net advertising income from airing on the Dish Network.  (Id.)  Hanby II executed the agreement on behalf of TVC.  (Id.)  Cline never received any money under the revenue agreement and alleges that TVC was never broadcast on the Dish Network nor did KVN have an agreement to broadcast on the Dish Network.  (Id. at ¶ 25.)  As the final component of the allegedly fraudulent scheme, Hanby II executed a promissory note on behalf of TVC payable to Cline, on February 25, 2003.  (Id. at ¶ 26.)  The note was given for "value received" by TVC (being the money paid by Cline to TVC under the revenue agreement).  Under the terms of the note, TVC agreed to pay Cline $500,000 with interest accruing on this amount at an annual rate of 10% from July 26, 2002, no later than February 24,

2004, together with all taxes which may be assessed on the
payment, plus reasonable costs of collection and attorney fees
incurred in collecting on the note.  (Promissory Note, attached
as Ex. E to Pl.'s Compl.)  Cline asserts that he has not received
any payment on the note and further contends that Hanby II had no
intention of satisfying TVC's obligations under the note.
(Compl. at ¶¶ 26-27.)

        KVN failed, and on August 26, 2004, it filed for
Chapter 11 protection in the United States Bankruptcy Court for
the Southern District of Florida.  On June 13, 2005, the
proceeding was converted to a Chapter 7 action.  (Compl. at ¶ 2.)

        Relevant to the motion to dismiss, on May 16, 2005, Dr.
Hanby and Cline entered into a "Revised Statute of Limitations
Tolling Agreement."  The agreement, drafted by Conrad, provides
in pertinent part

        1.  In consideration of the making, execution and
        delivery of the [sic] this Agreement, Clayton N. Cline
        shall withhold the immediate filing of legal
        proceedings pursuant to federal claims and pursuant to
        the State of West Virginia claims until July 1, 2005.

        2.  In addition to the making execution and
        delivery of this Agreement, Mark Hanby, agrees that
        the time period beginning on June 30, 2003; until and
        including December 31, 2005, ("the tolling period")
        will not be included in computing the running of any
        Statute of Limitations.  Mark Hanby, agrees not to
        raise the tolling period in any other defense raised

10

by him (including laches) that otherwise would be
available to him concerning the timeliness of any
legal proceeding that may be brought against him by
Clayton N. Cline, his heirs or legal representatives.

3.   The parties agree that nothing in the Tolling
Agreement should be construed as a Waiver of Clayton
N. Cline's rights against KVN, VCI [The Vision
Channel, Inc., referenced in this opinion and the
parties' briefing as "TVC"] or any of their officers
and/or directors (past and present).  If Mark Hanby
does not cause the claims of Clayton N. Cline to be
paid before July 1, 2005 or supply a Promissory Note
payable to Clayton N. Cline and acceptable to Clayton
N. Cline for payment of not less than Five Hundred
Fifty thousand Dollars ($550,000) executed by not less
than Mark Hanby, Clayton N. Cline reserves the right
to sue on all of his original claims and will not be
limited to an action on the above referenced Note.

4.   The parties hereto agree that this Agreement
(or any copy thereof) may be introduced into evidence
as proof of the tolling agreed to herein in all legal
proceedings that may be brought in Federal or State
Court.

(Revised Tolling Agreement, attached as Ex. A to Pl.'s Resp. to

Dr. Hanby's Mot. to Dismiss.)


On July 25, 2005, Cline instituted this action in the

Circuit Court of Kanawha County asserting four claims against the

defendants collectively.  Count I asserts fraud claims and

contends, in essence, that Cline suffered an injury of $1,000,000

related to defendants' misrepresentations and omissions of

material facts on July 15, 2002, and July 18, 2002.  (Id. at ¶

34.)  In Count II, Cline maintains a claim titled "Fraudulent

11

Inducement and/or Concealment" in which he contends that he was fraudulently induced by defendants to purchase KVN Series B common shares and enter into the revenue agreement with TVC.[10] (Compl. at ¶ 44.)  Count III asserts that "[d]efendants conspired together to make the fraudulent representations on July 15, 2002 and thereafter, knowing that if the working capital required for KVN to meet its financial needs through September 30, 2002 was not obtained from the public offerings of KVN shares, KVN's officers and directors had an oral agreement whereby they '[would] either advance funds, guarantee any needed financing, or [would] purchase shares of capital stock from [KVN] to meet its financial needs.'"  (Id. at ¶ 47.)  Under Count IV, Cline insists that the defendants have been unjustly enriched.[11]  (Id. at ¶ 55.)

On November 4, 2005, Dr. Hanby removed this action on

_____

[10] There appears to be some overlap between the claims asserted in Count I and Count II inasmuch as Cline's fraud claim in Count 1 also alleges that defendants "induced" Cline to purchase KVN Series B common shares and enter into the revenue agreement with TVC.  (Id. at ¶ 35.)

[11] Cline's complaint provides no specific allegations against Stephen Allison who was allegedly the securities counsel for KVN.  Additionally, Dale Hill, Senior Vice President and Technical Productions Director of KVN, was named as a defendant in the complaint.  He was subsequently dismissed by way of an agreed order entered December 1, 2006.

diversity grounds.[12]  On December 12, 2005, defendant Stephen

Allison, appearing pro se, filed an answer and counterclaim.[13]

Count I of his counterclaim is titled "malicious prosecution."

In the first paragraph of Count I of the counterclaim, Stephen

Allison maintains that he is not subject to the jurisdiction of

this court.  The counterclaim alleges that

> Defendant has been named as a Defendant in this
> lawsuit for the sole purpose to harass, intimidate and
> coerce the other defendants.  Defendant has had to
> spend significant time and resource [sic] to defend
> himself against a vicious, fact less and frivolous
> lawsuit, and is subject to receive damages from the
> Plaintiff for the malicious prosecution of this
> lawsuit.

(S. Allison Counterclaim at ¶¶ 5, 6.)  Count II of the

counterclaim is titled "Frivolous Lawsuit and Putative [sic]

Damages" and asserts that because of Cline's misrepresentations

and his failure to investigate the facts of this case, plaintiff

is entitled to "[p]utative [sic] damages both from the

[Counterclaim] Defendant and counsel from [sic; for] the

[Counterclaim] Defendant." (Id. at ¶ 8.)

On January 31, 2006, Hanby II was personally served,

---

[12] According to the allegations in the complaint, Dr. Hanby
is a resident of Tennessee, Hanby II is a resident of Arizona,
and the Allisons are residents of Georgia.

[13] The answer and counterclaim indicate that Stephen Allison
is a licensed attorney in Georgia.

but did not timely file an answer to the complaint.  On March 24, 2006, Cline filed a motion for default judgment.  On March 30, 2006, Hanby II filed <u>pro</u> <u>se</u>, without seeking leave, an answer to the complaint.[14]  Dale Allison, also appearing <u>pro</u> <u>se</u>, has answered Cline's complaint.

## II.

A motion to dismiss for failure to state a claim should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in the light most favorable to the plaintiff.  <u>Mylan Laboratories, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993), <u>cert.</u> <u>denied</u>, 510 U.S. 1197 (1994) (citations omitted); <u>see</u> <u>also</u> <u>Brooks v. City of Winston-Salem</u>, 85 F.3d 178, 181 (4th Cir. 1996).

---

[14] The motion for default judgment is still pending and will be addressed by way of a separate order.

14

III.

In his motion to dismiss, Dr. Hanby asserts that the court lacks subject matter jurisdiction and personal jurisdiction over him.  Additionally, he insists that Cline's claims do not state a claim upon which relief can be granted.[15]

A.    <u>Subject Matter Jurisdiction</u>

Dr. Hanby maintains that the court lacks subject matter jurisdiction inasmuch as the bankruptcy court is the proper venue for Cline's claims in this action.  Dr. Hanby further asserts that "plaintiff's claim against KVN must be adjudicated in bankruptcy court because the promissory note is not a personal guarantee by Dr. Hanby."  More specifically, Dr. Hanby contends that the promissory note replaced the revenue sharing agreement and the promissory note represents a "corporate guarantee of a high risk investment" that does not implicate Dr. Hanby.  Cline responds by observing that the claims against Dr. Hanby are asserted in his individual, not a corporate, capacity and these

---

[15] Dr. Hanby originally contended that Cline's claims were barred by the applicable statute of limitations; however, it appears that counsel for Dr. Hanby was not aware of the tolling agreement until Cline provided it as an exhibit to his response memorandum.  Dr. Hanby subsequently withdrew his statute of limitations argument in his reply memorandum.

15

claims in no way implicate the bankruptcy proceedings.  Neither party cites any authority in support of their divergent positions.

Dr. Hanby's position is without merit.  Cline's claims sound in tort under West Virginia law and the allegations against him are in his individual capacity.  It appears that the outcome of the proceeding before this court would have no effect on the bankruptcy action and there is nothing in the provisions of 11 U.S.C. § 362 that would automatically stay Cline's claims here. Accordingly, the court finds that subject matter jurisdiction is present.

B.    Personal Jurisdiction - Dr. Hanby

Typically, courts conduct a two-step inquiry to determine whether personal jurisdiction is appropriate, analyzing (1) whether the forum's long-arm statute authorizes service of process on the defendant, and (2) whether the service of process comports with the Due Process Clause.  Elliot Machine Corp. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993).

Our court of appeals has concluded that West Virginia's long-arm statute is "coextensive with the full reach of due process . . . ."  In re Celotex Corp.,124 F.3d 619, 627 (4th Cir.

16

1997) (citing <u>Pittsburgh Terminal Corp. v. Mid Allegheny Corp.</u>,
831 F.2d 522, 525 (4th Cir. 1987)).  Thus, the court need only
determine whether the exercise of personal jurisdiction here
comports with due process.

Due process requires that the defendant "have 'fair
warning that a particular activity may subject [[him]] to the
jurisdiction of a foreign sovereign.'"  <u>Burger King Corp. v.
Rudzewicz</u>, 471 U.S. 462, 471-72 (1985) (quoting <u>International
Shoe Co. v. Washington</u>, 326 U.S. 310, 319 (1945)).  The
touchstone of due process concerns whether the nonresident
defendant has sufficient minimum contacts with the forum state
such that the "'maintenance of the suit does not offend
traditional notions of fair play and substantial justice.'"
<u>Mitrano v. Hawes</u>, 377 F.3d 402, 406 (4th Cir. 2004) (quoting
<u>International Shoe Co.</u>, 326 U.S. at 316)).

"Minimum contacts exist where the defendant
'purposefully direct[s]' its activities toward the residents of
the forum."  <u>Elliot Machine Corp.</u>, 995 F.2d at 477 (quoting
<u>Burger King Corp.</u>, 471 U.S. at 472).  The defendant need not be
physically present in the forum.  <u>Id.</u> at 476.  Instead, a
defendant purposefully directs his activities toward the forum
"where the contacts proximately result from actions by the

17

defendant himself that create a 'substantial connection' with the forum[.]" <u>Burger King</u>, 471 U.S. at 475. "The relevant question is not where the contacts predominate, but only whether enough minimum contacts exist that the district court's assumption of specific jurisdiction satisfie[s] due process." <u>English & Smith v. Metzger</u>, 901 F.2d 36, 39 (4th Cir. 1990).

Our court of appeals has observed that when the presence of personal jurisdiction is being challenged

> the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge. In considering a challenge on such a record, the court <u>must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction</u>.

<u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989) (emphasis supplied).

In support of his contention that personal jurisdiction is not present, Dr. Hanby maintains that (1) there is no factual allegation or evidence that Dr. Hanby traveled to West Virginia or had any contact with plaintiff in West Virginia and (2) it is insufficient for purposes of establishing personal jurisdiction to simply allege that Dr. Hanby is a co-conspirator; rather, proof must be offered.

18

Cline asserts among other things that the court may exercise personal jurisdiction over Dr. Hanby under the conspiracy theory of jurisdiction.  Under this theory when individuals conspire to do something that they could reasonably expect to have consequences in a particular forum, if one co-conspirator who is subject to personal jurisdiction in the forum commits overt acts in furtherance of the conspiracy, those acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction even if they have no other contacts with the forum.

The Fourth Circuit has approved the exercise of long-arm jurisdiction pursuant to the conspiracy theory of personal jurisdiction.  McLaughlin v. McPhail, 707 F.2d 800, 807 (4th Cir. 1983); Lolavar v. De Santibanes, 430 F.3d 221, 229 (4th Cir. 2005)("[t]he court [in McLaughlin] accepted the conspiracy theory as a means of showing sufficient contacts with the State of Maryland to authorize in personam jurisdiction").  Under McLaughlin, however, a plaintiff seeking to use this theory must allege specific facts connecting the defendant with the forum to make a prima facie showing of personal jurisdiction and "the bare allegations of conspiracy or agency is insufficient to establish personal jurisdiction."  McLaughlin, 707 F.2d at 806;

19

see also Lehigh Valley Industries, Inc. v. Birenbaum, 527 F.2d
87, 93-94 (2d Cir. 1975).

        Cline maintains that Dr. Hanby participated in a
conspiracy in which, among other things, Dr. Hanby was aware
that Cline was from West Virginia and subsequently dispatched
his son to Charleston, West Virginia, to make numerous
fraudulent representations in an effort to induce Cline to
invest in KVN and TVC.  There is some circumstantial evidence of
record to support this assertion.  Dr. Hanby confirmed his
initial meeting with Cline did take place. (Dr. Hanby Depo. at
101-02, attached as Ex. 1 to Pl.'s Resp. to Dr. Hanby's Mot. for
S.J.)  Dr. Hanby told Cline that he would have to speak with
Hanby II to work out the details of the investment and then gave
Hanby II Cline's phone number.  (Id.)  Dr. Hanby's referral of
Cline to Hanby II occurred despite the fact that Dr. Hanby, as
CEO of KVN, was seemingly aware that KVN was a struggling
enterprise at the time he spoke with Cline in Georgia.  (Id. at
97-98.)  In accordance with McLaughlin, Cline has offered more
than bare allegations of conspiracy in this case.

        In view of the foregoing, the Court holds that Cline
has made a prima facie showing of personal jurisdiction with

respect to Dr. Hanby.[16]

C.   <u>Failure to State a Claim - Dr. Hanby</u>

Inasmuch as discovery in this matter has closed and summary judgment motions are pending, Dr. Hanby's allegation that Cline's complaint fails to state a claim is more appropriately resolved under the summary judgment standard, whereby the court can take into consideration evidence extrinsic to the parties' pleadings.

IV.

A.   <u>Personal Jurisdiction - Stephen Allison</u>

The sole basis for asserting personal jurisdiction over Stephen Allison is his alleged participation in the conspiracy.  While Stephen Allison has not filed a motion to dismiss on lack of personal jurisdiction grounds, his counterclaim makes such an assertion.[17]  He observes that he (1)

_____

[16] Cline also asserts that the tolling agreement provides an independent basis for personal jurisdiction over Dr. Hanby.  The court, having already found that Cline has made a prima facie showing of personal jurisdiction, need not address that argument.

[17] It is unclear why this allegation is presented in a counterclaim, as it would be more appropriately asserted as a defense in the answer or raised in a motion to dismiss.  Nonetheless, it is contained within a responsive pleading,

was never an officer or director of KVN, (2) did not prepare any
of the documents referenced in the allegations of the complaint,
(3) did not draft any documents that were filed with the SEC,
and (4) never met with Cline.

In contrast to Dr. Hanby, Cline appears to have no
evidence, inferential or direct, that Stephen Allison was
involved in the alleged conspiracy.  The docket indicates that
Cline has not undertaken discovery to develop any such evidence
in support of his conspiracy claim.  Moreover, a review of the
complaint reveals no factual basis for the conspiracy
allegations against Stephen Allison.  In light of the complaint,
which contains only a conclusional allegation that Stephen
Allison participated in a conspiracy, and the absence of any
evidence of record to suggest that he, in fact, participated in
the alleged conspiracy, he is entitled under McLaughlin to
dismissal on the ground that this court lacks personal
jurisdiction.[18]

_____

namely, the "answer and counterclaim."

[18] It is of no consequence that Stephen Allison both filed a
counterclaim and objected to the exercise of personal
jurisdiction.  Bayou Steel Corp. v. M/V Amstelvoorn, 809 F.2d
1147, 1149 (5th Cir. 1987)(holding that "the filing of a
counter-claim, cross-claim, or third-party demand does not
operate as a waiver of an objection to jurisdiction . . ."); see
also, Neifeld v. Steinberg, 438 F.2d 423, 428-29 (3d Cir. 1971).

22

B.   <u>Personal Jurisdiction - Dale Allison and Hanby II</u>

The United States Supreme Court has stated that "the requirement of personal jurisdiction represents first of all an individual right [and] it can, like other such rights, be waived."  <u>Ins. Corp. of Ir. Ltd., v. Compagnie des Bauxites de Guinee</u>, 456 U.S. 694, 703 (1982).  Under Fed. R. Civ. P. 12(h)(1), "[a] defense of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course."  Commentators have cautioned that Rule 12(h)(1) "advises a litigant to exercise great diligence in challenging personal jurisdiction, venue or service of process." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1391 (3d ed. 2004).  Neither Dale Allison nor Hanby II has asserted the defense of lack of personal jurisdiction in

_____

However, inasmuch as personal jurisdiction is absent with respect to Stephen Allison, he may not proceed in this action with his counterclaim.  See Dragor Shipping Corp. v. Union Tank Car Co., 378 F.2d 241, 244-45 (9th Cir. 1967)(district court lacked personal jurisdiction for the purposes of the complaint and accordingly "did not have in personam jurisdiction . . . for any purpose").  The court thus finds Cline's motion to dismiss Count I of Stephen Allison's counterclaim is moot.

their respective answers or motions and the court finds that

they have waived this defense.[19]

   C.   Statute of Limitations - Dale Allison

        In the proposed pretrial order, Dale Allison asserts

for the first time that Cline's claims are barred by the statute

of limitations.  Our court of appeals has recognized that

>    [T]he statute of limitations is an affirmative
>    defense, meaning that the defendant generally
>    bears the burden of affirmatively pleading its
>    existence.  See Fed. R. Civ. P. 8(c);[20] Dean v.
>    Pilgrim's Pride Corp., 395 F.3d 471, 474 (4th Cir.
>    2005)("The raising of the statute of limitations .
>    . . constitutes an affirmative defense.").  Where
>    a defendant has failed to raise a statute of
>    limitations defense by way of its answer, the
>    defense is usually waived.  See Peterson v. Air
>    Line Pilots Ass'n Int'l, 759 F.2d 1161, 1164 (4th
>    Cir. 1985); see also Brooks v. City of

---

[19] It seems unlikely that, under the facts of this case,
Hanby II would be able to successfully challenge the personal
jurisdiction requirement.

[20] Rule 8(c) of the Federal Rules of Civil Procedure
provides as follows:

>    Affirmative Defenses. In pleading to a preceding
>    pleading, a party shall set forth affirmatively
>    accord and satisfaction, arbitration and award,
>    assumption of risk, contributory negligence,
>    discharge in bankruptcy, duress, estoppel, failure
>    of consideration, fraud, illegality, injury by
>    fellow servant, laches, license, payment, release,
>    res judicata, statute of frauds, statute of
>    limitations, waiver and any other matter
>    constituting an avoidance or affirmative defense.

> <u>Winston-Salem</u>, 85 F.3d 178, 181 (4th Cir.
> 1996)(observing that an affirmative defense may
> also be raised in a pre-answer motion pursuant to
> Rule 12(b)(6) of the Federal Rules "when the face
> of the complaint clearly reveals [its]
> existence").

<u>Eriline Co. S.A. v. Johnson</u>, 440 F.3d 648, 653-54 (4th Cir.

2006).  The Fourth Circuit has further recognized that if an

affirmative defense is raised in a manner that does not result

in unfair surprise to the opposing party, failure to comply

with Rule 8(c) will not result in waiver of the defense.

<u>Peterson v. Air Line Pilots Ass'n, Int'l</u>, 759 F.2d 1161, 1164

(4th Cir. 1985).

       The court finds that Dale Allison's failure to timely

raise his statute of limitations defense has resulted in his

waiver of the defense inasmuch as it was asserted, for the

first time, in the proposed pretrial order on the eve of trial

after discovery has closed.  To permit him to pursue this

previously unasserted defense at trial would result in unfair

surprise and prejudice to Cline.

IV.

       It is accordingly ORDERED that

       (1) Dr. Hanby's motion to dismiss be, and it hereby

25

is, denied to the extent it seeks dismissal of this action on
the grounds that subject matter and personal jurisdiction are
not present; and, to the extent the motion seeks dismissal for
failure to state a claim upon which relief may be granted, it
is denied without prejudice;

(2) Stephen Allison be, and he hereby is, dismissed
from this action;

(3) Cline's motion to dismiss Count I of Stephen
Allison's counterclaim be, and it hereby is, dismissed as moot;
and

(4) Dale Allison is not permitted to pursue his untimely
statute of limitations defense.

The Clerk is directed to forward copies of this
memorandum opinion and order to all counsel of record and the
pro se defendants.

DATED: December 13, 2006

John T. Copenhaver, Jr.
United States District Judge

26